AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Target Phone 1: LG LS860,
IMEI 307KPQJ0096172

)
)
)
)
)
)

Case No.    MR 21-1040

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A

located in the _____ District of _____ **New Mexico** _____, there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1962(c),(d); 924 (c); 922(g); 2; 792; 21 U.S.C. §§ 841(a)(1), 856; 846. | RICO Act and RICO Act conspiracy; Use of a firearm in furtherance of a drug trafficking crime; FIP; Aiding and abetting; Harboring or concealing a fugitive; PWITD controlled substance and conspiracy; Maintain drug involved premises1 |

The application is based on these facts:

See attached affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Jordan Spaeth, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date:    07/27/2021

_____
*Judge's signature*

City and state:    Albuquerque, New Mexico

John F. Robbenhaar, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

## <u>INTRODUCTION</u>

1.     I, Jordan Spaeth, Special Agent of the Federal Bureau of Investigation ("FBI"), being first duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—17 electronic devices as described in Attachment A (collectively referred to as "TARGET PHONES")—which are currently in the lawful custody of the Federal Bureau of Investigation ("FBI"), and the extraction from that property of electronically stored information described in Attachment B. The TARGET PHONES are described as follows:

    a.  **Target Phone 1:** LG LS860**,** IMEI 307KPQJ0096172;

    b.  **Target Phone 2:** Black Samsung smartphone, model SM-J727T1, unknown IMEI;

    c.  **Target Phone 3:** Kazuna KAZ-F019, IMEI 351003992579903;

    d.  **Target Phone 4:** Unimax U683CL, IMEI 99015181956285;

    e.  **Target Phone 5:** Motorola Moto E6, IMEI 352178100433810;

    f.  **Target Phone 6:** Motorola Moto G Stylus, IMEI 355539116635663;

    g.  **Target Phone 7:** Motorola Moto G Stylus, IMEI 359081100918132;

    h.  **Target Phone 8:** Samsung GT-P5210, Tablet S/N RF2D8138W8N;

    i.  **Target Phone 9:** LG LM-Q730MM, IMEI 354525111224802;

    j.  **Target Phone 10:** Samsung SM-G998U, IMEI 350121670712280;

    k.  **Target Phone 11:** Apple iPhone 11 Pro Max, IMEI 353906105003215;

    l.  **Target Phone 12:** Black LG smartphone with cracked screen, unknown IMEI;

    m.  **Target Phone 13:** LG Tribute Dynasty**,** IMEI 359634097890852**;**

    n.  **Target Phone 14:** LG L322DL**,** IMEI 351262762524859;

    o.  **Target Phone 15:** Motorola Moto G7 Supra**,** IMEI 359526093317106;

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

    p.  **Target Phone 16:** Motorola Moto G7 Supra, IMEI 359526096800108;

    q.  **Target Phone 17:** Blue LG smart phone, S/N: 101UTTD0748265.

2.      The TARGET PHONES were seized by the FBI and collected as evidence pursuant to federal search warrants (21MR718, 21MR719, 21MR721, 21MR723, and 21MR724) on June 2, 2021 as part of the on-going criminal investigation into the Brew Town Locos ("BTL") street gang. The TARGET PHONES are currently located at the FBI Albuquerque Field Office, 4200 Luecking Park Avenue Northeast, Albuquerque, New Mexico. In my training and experience I know that the TARGET PHONES have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the TARGET PHONES first came into the possession of the FBI.

3.      The applied-for warrant would authorize the forensic examination of the TARGET PHONES for the purpose of identifying electronically stored data particularly described in Attachment B. This application seeks a warrant authorizing law enforcement officers working this investigation to search all responsive records and information associated with the TARGET PHONES for evidence pertaining to violations of:

    a.  18 U.S.C. §§ 1962(c), (d) - Racketeer Influenced and Corrupt Organizations (RICO) Act and RICO Act conspiracy;

    b.  18 U.S.C. § 924(c) - Use of a firearm in furtherance of a drug trafficking crime;

    c.  18 U.S.C. §§ 922(g) and 924 - Prohibited person in possession of a firearm or ammunition;

    d.  21 U.S.C. §§ 841(a)(1) - Possession with intent to distribute a controlled substance and distribution of a controlled substance;

    e.  21 U.S.C. § 856 - Maintain drug involved premises;

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

f.  21 U.S.C. § 846 - Conspiracy to possess with intent to distribute a controlled substance or conspiracy to distribute a controlled substance;

g.  18 U.S.C. § 2 - Aiding and abetting;

h.  18 U.S.C. § 792 - Harboring or concealing a fugitive.

4.      The specific evidence being sought has been detailed within Attachment B, which has been attached hereto and incorporated herein. This affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in this matter; however, the affidavit sets forth only the facts that support probable cause to search the TARGET PHONES, as well as relevant background information. Any observations referenced herein that I did not personally witness were relayed to me in oral or written reports by members of the investigative team, who assisted during this investigation, which remains open.

5.      During my investigation, I have developed information I believe to be reliable from the following sources:

a.  Information from the Drug Enforcement Administration ("DEA"), U.S. Marshals Service ("USMS"), U.S. Bureau of Prisons ("BOP"), U.S. Probation Office ("USPO"), New Mexico Corrections Department ("NMCD"), Cibola County Correctional Center ("CCCC") and other law enforcement or corrections officials (also referred to herein as "agents"), including oral and written reports;

b.  Results of physical surveillance;

c.  Information provided by undercover agents and informants;

d.  Information derived from consensually recorded conversations;

e.  Information provided by cooperating defendants and/or the defense attorneys representing those persons;

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

  f. Information derived from lawfully intercepted wire communications, to include telephone, text, email, and video; and

  g. Records from the FBI National Crime Information Center ("NCIC"), U.S. District Courts, New Mexico Courts, and the New Mexico Motor Vehicle Division.

6.      Where I refer to conversations herein, they are related in substance and, in part, based on conversations between fellow agents, task force officers, other law enforcement personnel, or confidential human sources that assisted law enforcement. Any observations referenced herein that I did not personally witness were relayed to me in oral and/or written reports by agents of the FBI or other agencies. All figures, times, and calculations set forth herein are approximate. Unless otherwise specified, weights of controlled substances are approximate and are based on gross measurements.

**AFFIANT'S RELEVANT TRAINING AND EXPERIENCE**

7.      I am a Special Agent with the FBI and have been a sworn law enforcement officer for more than 12 years, serving as a police officer and FBI Special Agent. I have been with the FBI since 2018 and am currently assigned to the Albuquerque Violent Crime and Gang Task Force ("VCGTF") and the FBI Albuquerque's Indian Country program. As a member of the VCGTF, I investigate violent gangs who are primarily comprised of violent repeat offenders engaged in narcotics trafficking, federal firearms violations, and other violent crime. As a member of the Indian Country program, I investigate serious felonies to include, but not limited to, homicide, child sexual assault, arson, and assault on federal officers, which occur within the exterior boundaries of the multiple Indian Reservations surrounding Albuquerque, New Mexico.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

8.      My investigative training and experience includes, but is not limited to, interviewing subjects, targets, and witnesses, writing affidavits for and executing search and arrest warrants, collecting evidence, conducting surveillance, and analyzing public records. Over the course of my career, I have arrested hundreds of persons for offenses relating to armed robberies, firearm violations, bank robberies, illegal narcotics, and other criminal conduct. I have also been responsible for serving subpoenas and supervising cooperating sources, as well as analyzing phone records.

9.      Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations ("DTO"s), and gang/criminal enterprises to purchase, transport, store, and distribute controlled substances. I am also familiar with how those individuals and organizations utilize cell phones similar to the TARGET PHONES to facilitate their drug trafficking ventures.

10.     Through my training and experience, I am aware that drug traffickers and DTO's utilize cell phones similar to the TARGET PHONES to conduct their business, access bank accounts and/or transfer money, to advertise their product, communicate with sources of supply and would be buyers. I know that cell phones, similar to the TARGET PHONES, are used by individuals, DTO's, and gang/criminal enterprises to conduct their business. It has been my experience that the items I have described herein are often stored by individuals involved in drug trafficking in their cellular telephones and electronic devices similar to the TARGET PHONES.

11.     I have observed persons involved in drug trafficking use messaging applications and pre-paid phones requiring no subscriber information, and even use fictitious names, or the names of others, to register the cellular phones used to advance their unlawful activities. These cellular phones often contain names and phone numbers of other co-conspirators, text messages

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

utilized to further illicit activities, photographs and videos of controlled substances, drug proceeds, and/or firearms. Additionally, I am also familiar with the increasingly popular use of text messaging, instant messaging, electronic mail, and smartphone applications like Facebook and Snapchat used by gang/criminal enterprises and DTOs to advance their unlawful activities.

12.      Based upon my training, experience, and participation in the investigation of gang/criminal enterprises and DTOs, I am aware individuals engaged in drug distribution often utilize cellular telephones, such as the TARGET PHONES, to maintain documents and records relating to their distribution activities. This documentary evidence includes, but is not limited to, telephone numbers, telephone books, address books, travel receipts, records in fictitious or coded names, false identification, financial records, money order receipts, money remittance receipts, money collection logs, such as "tally" sheets, drug load sheets, or shipping/mailing receipts.

13.      I know that firearms are tools of the trade and instrumentalities of the crime of drug trafficking, particularly in instances involving subjects who have committed prior violent crimes and/or firearms violations. Based on my training and experience, these individuals utilize cellular telephones similar to the TARGET PHONES as a means to facilitate the illegal purchase and sale of firearms.

14.      I am aware that members of DTOs often maintain records of their transactions in manners similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, especially when debts remain open; the status of accounts receivable and accounts payable; the names and phone numbers of suppliers, customers, co-conspirators, and other associates who may assist drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money (U.S. currency derived from drug trafficking),

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. currency into financial institutions in such a way so as to avoid the detection of law enforcement, and any reporting requirements of banking institutions. These records can be maintained on cellular phones similar to the TARGET PHONES in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets (drug ledgers), IOU's, miscellaneous notes, money orders, customer lists, and phone address books.

15.    Based on my training and experience, I know that drug traffickers often utilize cell phones, similar to the TARGET PHONES, as a means to facilitate drug trafficking operations. I also know that drug traffickers often own and utilize multiple cell phones, phone numbers, and smartphone applications in an attempt to avoid detection by law enforcement.

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

16.    On May 27, 2021, FBI Special Agent Bryan Acee obtained seven search warrants regarding the on-going investigation into the Brew Town Locos (BTL) street gang. The warrants were approved by United States Magistrate Judge Jerry H. Ritter and authorized agents to search the premises and persons for evidence of violations of 18 U.S.C. §§ 1962(c),(d), 924(c), 922(g), and 21 U.S.C. §§ 856, 846, and 841(a)(1).

17.    On June 2, 2021, Agents and officers with the FBI, Albuquerque Police Department (APD), Bernalillo County Sheriff's Office (BCSO), New Mexico State Police, Drug Enforcement Administration (DEA), and the United States Marshals Service (USMS), executed federal search warrants at seven residences, including:

- A-1: 4933 Olympia Road NW, Albuquerque, NM, cause number 21MR718,

- A-2: 620 Horseshoe Trail SE, Albuquerque, NM, cause number 21MR719,

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

- A-3: 5741 Osuna Road NE, #714, Albuquerque, NM, cause number 21MR721,

- A-4: 517 Dorothy Street NE, Albuquerque, NM, cause number 21MR723,

- A-5: 312 Aztec Road NW, Albuquerque, NM, cause number 21MR724.

18.     Collectively, A-1, A-2, A-3, A-4, and A-5 will be referred to as the **Subject Premises**. During the execution of the search warrants, law enforcement officers located several items at the subject premises, including but not limited to:

    a.   20 firearms, including a machine gun, assault rifles, a sawed off shotgun, handguns, short barrel rifle;

    b.   Extended and drum style magazines;

    c.   Suppressor;

    d.   Thousands of rounds of ammunition;

    e.   About three pounds of methamphetamine;

    f.   Distribution quantities of fentanyl;

    g.   Heroin and loaded needles[1];

    h.   About three pounds of marijuana;

    i.   More than $11,500 in U.S. currency;

    j.   TARGET PHONES 1, 2, 3, 4, and 5 were located at A-1;

    k.   TARGET PHONES 6 and 7 were located at A-2;

    l.   TARGET PHONES 8, 9, 10, and 11 were located at A-3;

    m.   TARGET PHONE 12 was located at A-4; and

    n.   TARGET PHONES 13, 14, 15, 16, and 17 were located at A-5.

---

[1] Loaded needles are needles filled with narcotics which are ready to be injected.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

19.     The items listed above were found in various locations throughout the **Subject Premises** A-1, A-2, A-3, A-4, A-5 and will be more fully described below.

20.     Evidence obtained during this investigation shows that DAVID CHAVEZ, aka "FLACO," EDNAMAY DELAROSA, ORLANDO ROYBAL, aka "ORLIE," FRANK MADRID, aka "BENZO," ELIZABETH PEREZ, aka "BREW TOWN QUEEN," and CHRISTOPHER MICHAEL PEREZ, aka "LIL CHUCO," aka "LIL CHRIS," (Collectively referred to as the "TARGET SUBJECTS") distribute illegal narcotics from the subject premises. Further, probable cause, which is contained herein, shows that the subject premises were being used to facilitate the violations listed on pages 2 and 3 of this affidavit.

21.     Therefore, since the facts contained herein will show that the subject premises were used to facilitate the aforementioned violations, I believe the TARGET PHONES, which were seized from the subject premises, were also used to facilitate the above violations.


## THE BTL CRIMINAL ENTERPRISE

22.     The BTL gang, including its leadership, membership, prospects, and associates, constitute an enterprise as defined in 18 U.S.C. § 1959(b)(2), that is, a group of individuals associated in fact that engage in, and the activities of which, affect interstate commerce. The enterprise constitutes an ongoing organization whose members and associates function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

23.     I am aware members and associates of the BTL commit, conspire, attempt, and threaten to commit acts of violence to protect and expand the enterprise's criminal operations and reputation. Historically, the BTL generated income by distributing controlled substances, and

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

participating in robberies and burglaries. To maintain the BTL criminal enterprise, members of the gang discuss:

      a.  drug acquisition, distribution, pricing and debt collection;

      b.  encounters with law enforcement;

      c.  the presence of suspected law enforcement agents or vehicles in the BTL neighborhood;

      d.  the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; and

      e.  possession of weapons and firearms, as well as ways to conceal these crimes.

24.      With regard to the possession and concealment of weapons and firearms, I am aware members of the BTL use, possess, and conceal firearms and edged weapons. These weapons are used and possessed by members of the gang to commit murders; attempted murders; assaults; robberies; to protect illicit drug supplies; to avoid arrest or escape from custody; to intimidate rivals, victims, witnesses; and for other criminal activity.

25.      I am aware some incarcerated members of the BTL have joined the SNM prison gang, while others have aligned themselves with the Burqueños prison gang.

## THE HISTORY OF THE BTL

26.      The BTL is a predominately Hispanic, multigenerational, gang founded in the late 1970s in the North Valley area of Albuquerque, New Mexico. The BTL gang presently claim the territory between Montano Road to the north, Interstate 40 (I-40) to the south, 12th Street Northwest to the west and Edith Boulevard to the east.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

27.     Over the years, the BTL gang expanded throughout New Mexico to include cliques in Grants, New Mexico, and Taos, New Mexico. Active and former BTL members, as well as gang detectives, have described the BTL as a powerful "old school" Albuquerque gang with a reputation for having cartel connections and an arsenal of firearms.

28.     I am aware BTL gang members identify themselves with distinct symbols, letters, words and numbers, to include: an eight-legged spider, the letters "BTL," "BTS," "BT," or "BTSL," the words "Brew Town Locos," "Brew Town Spiders," "Brew Town Spider Locos," "Brew," and "Brew Town." BTL gang members also utilize the New Mexico Zia symbol and numbers 107, which correspond to the last three digits of the Zip Code 87107, which covers the general area the BTL operate within. BTL members frequently display these symbols, numbers, letters and words in their tattoos, graffiti, social media photos, drawings, and on clothing as a way of displaying their affiliation, loyalty, and commitment to the BTL.

29.     The BTL gang strives to have a reputation for being strong and powerful and must maintain its membership to continue functioning as an organization on the streets. If the BTL is perceived as being weak, then rival gangs could challenge and assault its members and take over its territory. This could cause the BTL to lose membership and eventually dissolve. If the BTL maintains a large membership and a reputation for being dominant, rival gangs may think twice before they challenge it. Similarly, victims and witnesses may think twice about assisting authorities with any prosecution attempt against the gang. FBI and APD case agents have encountered potential witnesses and victims who were too afraid to speak with law enforcement and much less willing to testify against BTL members. A member of the BTL is expected to seek out and beat, stab, or shoot rival gang members and informants.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

30.     BTL members frequently commit "branded" criminal acts, in other words, they commit crimes in the name of the gang. Examples of branded criminal acts include: gang members shouting references to BTL before or during a crime; gang members demanding drugs, or property because of their membership; and gang members killing or attempting to kill members of rival gangs.

31.     Weapons, to include blunt force and edged weapons, firearms, and ammunition are important tools of the trade and instrumentalities of the BTL gang.

32.     BTL prospective gang members must be ranked into the gang by senior members of the BTL, or they may be "born in" via a family member. Members who have cooperated with law enforcement are removed from the gang through violent actions, such as beatings, robbery, and murder. Membership is otherwise for life.

## THE CONFIDENTIAL HUMAN SOURCES, COOPERATING DEFENTANTS AND CITIZEN WITNESSES UTILIZED IN THE INVESTIGATION

33.     During the course of this investigation, FBI case agents utilized several Confidential Human Sources ("CHS" for singular and plural reference) to infiltrate and report on the activities of the BTL. Several cooperating defendants and citizen informants also reported on the criminal activities of the Target Subjects. Seven CHS, five cooperating defendants, and two citizen informants were utilized to collect information in the instant investigation. In the paragraphs that follow, I have provided an overview of each CHS, to include

     a.   their basis of knowledge concerning the criminal conduct;

     b.   motivation to assist the FBI;

     c.   criminal history;

     d.   any compensation received from the government; and

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

    e.  a statement concerning their reliability.

I tried to provide sufficient information to the Court, while balancing the anonymity and safety of the various sources.

    34.    **CHS-1** is an experienced drug trafficker and knows several veteran BTL street gang members. At one time, CHS-1 distributed methamphetamine and heroin with members of the BTL. Over the past few years, CHS-1 aided in the collection of evidence against members and associates of the BTL, as well as other criminal enterprises. CHS-1 participated in coordinated controlled operations against several Albuquerque drug traffickers. Information provided by CHS-1 contributed to the issuance of more than 50 federal search warrants, the arrest of multiple suspects, and the recovery of firearms, ammunition, assets, U.S. currency and significant quantities of controlled substances. CHS-1 is motivated to assist the FBI in anticipation of receiving a positive recommendation in a pending criminal matter. CHS-1 has prior felony convictions for drug trafficking and being a felon in possession of a firearm. CHS-1 has received approximately $1,100 in financial assistance from the FBI.[2] I consider the information CHS-1 provided to be reliable because much of it was corroborated through law enforcement investigation, controlled buys, and both physical and electronic surveillance. To my knowledge, CHS-1's information has not been found to be false or misleading.

    35.    **CHS-2** is an experienced drug trafficker and a member of the BTL. CHS-2 was paid to assist the FBI in the investigation of the BTL and has received approximately $3,900 in financial assistance from the FBI. Information provided by CHS-2 has led to the issuance of 15 search warrants, the arrest of multiple suspects, and the recovery of firearms, ammunition, U.S.

---

[2] Financial assistance includes general payments, moving expenses, and fuel for the CHS's vehicle during operational support to the FBI.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

currency and distribution quantities of controlled substances. CHS-2 identified individuals believed to be members or associates of the BTL. CHS-2 has prior felony convictions for battery upon a peace officer, possession of a controlled substance, residential burglary, and trafficking a controlled substance. I consider the information CHS-2 provided to be reliable because much of it was corroborated through law enforcement investigation, controlled buys, and both physical and electronic surveillance. To my knowledge, CHS-2's information has not been found to be false or misleading.

36.     **CHS-3** is an experienced drug trafficker and BTL associate. CHS-3 has participated in the distribution of drugs for the BTL and has first-hand knowledge concerning the BTL's distribution network. Information provided by CHS-2 has led to the issuance of seven (7) search warrants, the arrest of multiple suspects, and the recovery of firearms, ammunition, U.S. currency and distribution quantities of controlled substances. CHS-3 has participated in multiple controlled drug buys from members of the BTL and is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-3 has a prior felony conviction for a crime of moral turpitude and does not have any pending charges. CHS-3 has received $3,050 from the FBI. I consider the information CHS-3 provided to be reliable because much of it was corroborated through law enforcement investigation, controlled buys, and both physical and electronic surveillance. To my knowledge, CHS-3's information has not been found to be false or misleading.

37.     **CHS-4** is a street and prison gang associate and has been for approximately 20 years. CHS-4 knows several veteran BTL street gang members and at one time, CHS-4 distributed heroin with and among members of the BTL. During that period of time, CHS-4 relied on members of the BTL and a related prison gang for protection and to help CHS-4 collect drug debts. Over the past few years, CHS-4 aided the FBI in the collection of evidence against gang members and

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

associates. Information provided by CHS-4 led to the issuance of at least 27 federal search warrants, the arrest of multiple suspects, and the recovery of firearms, ammunition, U.S. currency and significant quantities of controlled substances. CHS-4 is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-4 has prior felony convictions for heroin trafficking, burglary, receiving a stolen vehicle and larceny. CHS-4 does not have any pending charges. CHS-4 has received more than $10,000 from the FBI. I consider the information CHS-4 provided to be reliable because much of it was corroborated through law enforcement investigation, controlled buys, and both physical and electronic surveillance. To my knowledge, CHS-4's information has not been found to be false or misleading.

38.    **CHS-5** is an associate of an Albuquerque street gang that is aligned with the BTL. CHS-5 identified individuals believed to be members and associates of the BTL and provided historical information on the BTL's origin, history, membership, structure, and criminal endeavors. CHS-5 is motivated to assist the FBI in anticipation of receiving a positive recommendation in a pending criminal matter. CHS-5 has prior felony convictions for being a felon in possession of a firearm, possession of a controlled substance, escape from jail, receiving stolen property, and unlawful taking of a motor vehicle. I found the information from CHS-5 to be reliable because much of it was corroborated by independent source information, other law enforcement investigations and physical surveillance. To my knowledge, CHS-5's information has not been found to be false or misleading.

39.    **CHS-6** is a former street gang member and drug distributor. CHS-6 is familiar with the inner-workings of street gangs in New Mexico and provided background information about the membership, structure, and customs of the BTL. CHS-6 identified individuals believed to be members or associates of the BTL. CHS-6 maintains contact with gang members who sell

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

controlled substances with the BTL, for the BTL, or are supplied by members of the BTL. CHS-6 assisted the FBI in a gang investigation a couple of years ago that resulted in the issuance of 21 federal search warrants, the arrest of multiple suspects, and the recovery of firearms, ammunition, U.S. currency and significant quantities of controlled substances. CHS-6 may be viewed as a citizen informant, as CHS-6 only came forward to prevent current and future violent crime. Moreover, the information CHS-6 provided to the FBI could be a statement against interest, as CHS-6 admitted to participating in past criminal activities that could expose CHS-6 to state or federal prosecution. CHS-6 has prior felony convictions for aggravated assault upon a peace officer with a deadly weapon, battery, burglary, and possession of a controlled substance. I found the information from CHS-6 to be reliable because much of it was corroborated by independent source information, other law enforcement investigations and physical surveillance. To my knowledge, CHS-6's information has not been found to be false or misleading.

40.     **CHS-7** is a BTL associate and has participated in drug distribution with BTL members and associates. CHS-7 has first-hand knowledge concerning the BTL's distribution network. CHS-7 has identified members of the BTL, provided background information on the gang, and participated in controlled drug buys in furtherance of FBI investigations. CHS-7 is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-7 has prior felony convictions for possession of a controlled substance (x2) and identity theft. CHS-7 has not been paid by the FBI and does not have any pending criminal charges. I consider the information CHS-7 provided to be reliable because much of it was corroborated through law enforcement investigation, controlled buys, and both physical and electronic surveillance. To my knowledge, CHS-7's information has not been found to be false or misleading.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

41.     **Cooperating Defendant 1 (CD-1)** is a member of the BTL and has distributed drugs for the BTL for many years. CD-1 is familiar with the history, membership, recruitment, drug trafficking, and other criminal activities of the BTL. FBI agents arrested CD-1 and CD-1 is currently facing federal charges. CD-1 has a prior felony conviction for possession of a controlled substance.

42.     **Cooperating Defendant 2 (CD-2)** is a member of a street and prison gang aligned with the BTL. CD-2 distributed drugs with BTL members on the street and in jail. FBI agents arrested CD-2 and CD-2 is currently in-custody on federal charges. CD-2 has prior felony convictions for armed robbery with a deadly weapon, aggravated battery, conspiracy, receiving or transferring stolen motor vehicle, possession of a controlled substance (x2) and RICO Conspiracy.

43.     **Cooperating Defendant 3 (CD-3)** is a member of a street and prison gang aligned with the BTL. CD-3 distributed drugs with BTL members on the street and in jail. FBI agents arrested CD-3 and CD-3 has pending federal charges. CD-3 has prior felony convictions for being a felon in possession of a firearm (x3) and possession of a controlled substance.

44.     **Cooperating Defendant 4 (CD-4)** is a member of the BTL and has distributed drugs for the BTL for many years. CD-4 is familiar with the history, membership, recruitment, drug trafficking, and other criminal activities of the BTL. FBI agents arrested CD-4 and CD-4 is currently facing federal charges. CD-4 has a prior felony conviction for assault with a deadly weapon.

45.     **Cooperating Defendant 5 (CD-5)** is a member of the BTL and has distributed drugs with other BTL members and within the BTL territory for more than 25 years. CD-5 is familiar with the history, membership, recruitment, drug trafficking, and other criminal activities

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

of the BTL. FBI agents arrested CD-5 and CD-5 is currently facing federal charges. CD-5 has a prior felony conviction for trafficking a controlled substance.

46.     **Citizen 1** is a citizen informant with no criminal history. Citizen 1 recently retired after serving as an officer and supervisor with a government agency. Citizen 1 agreed to assist the FBI to help rid the community of violent drug dealers in Citizen 1's neighborhood.

47.     **Citizen 2** is a citizen informant with no criminal history. Citizen 2 works for the state judiciary and maintains a watchful eye on Citizen 2's neighborhood. Citizen 2 agreed to assist the FBI to help protect his/her neighborhood from crime.

48.     As described in detail below, I believe the facts set forth in this affidavit provide probable cause to believe that the TARGET PHONES were seized from DAVID CHAVEZ, aka: "FLACO," EDNAMAY DELAROSA, ORLANDO ROYBAL, aka: "ORLIE," FRANK MADRID, aka: "BENZO," ELIZABETH PEREZ, aka: "BREW TOWN QUEEN," and CHRISTOPHER PEREZ, aka: "LIL CHUCO," aka: "LIL CHRIS," who are involved in a conspiracy to distribute controlled substances around Albuquerque and within the Cibola County Correctional Center.

### STATEMENT OF PROBABLE CAUSE

49.     Over the past few months, FBI VCGTF investigators and APD gang detectives have been monitoring the activities of the Target Subjects via physical and electronic surveillance, as well as through the utilization of informants, cooperating defendants and citizen witnesses. Based on surveillance and source reporting, as well as my knowledge and experience concerning the modus operandi of the BTL, I believe DAVID CHAVEZ, aka: "FLACO," EDNAMAY DELAROSA, SAM ADAMS WILLIAMS, ORLANDO ROYBAL, aka: "ORLIE," EUSEBIO DEVARGAS, FRANK MADRID, aka: "BENZO," CHRISTOPHER PEREZ, aka: "CHUCO,"

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

CHRISTOPHER MICHAEL PEREZ, aka: "LIL CHUCO," aka: "LIL CHRIS," NATHON
CONTINOLA, aka: "BONES," ROBERT RIVERA, aka: "PEANUT," LEONARD DANIEL
SILVA, aka: "JINX," DOMINIC SOTO, aka: "SHADOW," MARTIN DURAN, aka: "WERO,"
JOHNNY SAN JUAN ARAGON, aka: "SPOOKY," ALEJANDRO MOYA, aka: "ALEX,"
JORGE OCHOA-PEREZ, ELIZABETH PEREZ, aka: "BREW TOWN QUEEN," and others, are
suspected of participating in an on-going conspiracy to distribute controlled substances in
furtherance of the BTL's objectives and purposes. I believe the drug distribution scheme is
dependent on the strength, influence, and reputation of the BTL.

50.     The BTL, like most Albuquerque street gangs, is largely comprised of dedicated
career criminals. All of the Target Subjects have impressive criminal histories with significant
experience in the criminal justice system. The Court may take special notice of two of the Target
Subject's (DAVID CHAVEZ and ORLANDO ROYBAL), as they were serving terms of federal
supervised release under the jurisdiction of the Court at the time the TARGET PHONES were
seized. Moreover, the BTL are believed to be supplying significant quantities of drugs to inmates
at the Cibola County Correctional Center, where the bulk of the District's federal detainees are
housed.

51.     In the paragraphs that follow, I have described the Target Subject's alleged
involvement in a pervasive drug distribution conspiracy plaguing the community, as well as the
Cibola County Correctional Center. I have also sought to identify the Target Subjects in greater
detail and note whether they are BTL members or associates. I have also included the arrest history

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

of the Target Subjects, and where possible, noted the felony offenses for which they were convicted.[3]

52.    **DAVID CHAVEZ, aka: "FLACO,"** is a member of the BTL street gang. DAVID CHAVEZ has at least 12 prior arrests in New Mexico with felony convictions for murder in the first degree, shooting at or from a motor vehicle, possession with intent to distribute heroin, possession of a firearm in furtherance of a drug trafficking crime, and being a felon in possession of a firearm. When TARGET PHONES 1, 2, 3, 4, and 5 were seized from DAVID CHAVEZ, he was serving a term of supervised release (TSR) under the supervision of the U.S. Probation Office in Albuquerque, Case No 14-CR-00748-JAP. The TSR stemmed from a 2014 conviction within the District of New Mexico for possession with intent to distribute heroin, possession of a firearm in furtherance of a drug trafficking crime, and being a felon in possession of a firearm. I believe DAVID CHAVEZ may be considered a "career offender" within the meaning set forth in the U.S. Sentencing Guidelines (USSG) (§4B1.1.)[4] and may be subject to prosecution under the Armed Career Criminal Act (ACCA)[5]. Following the execution of search warrant 21MR718 and seizure

---

3 Criminal history records were obtained from the FBI's National Criminal Information Center (NCIC). I believe the records accurately reflect the subject's arrest record; however, conviction data is often not listed, or listed as "disposition unknown," because not all arresting agencies enter post-arrest data. In order to compile conviction data, I also consulted NM Courts online and the U.S. District Court Public Access to Court Electronic Records (PACER). Where possible, I have listed the subject's arrests and convictions.

4 A defendant is a Career Offender if (1) he or she has been convicted in federal court of a felony crime of violence or drug-trafficking offense committed as an adult, and (2) has at least two prior felony convictions for either a crime of violence or drug trafficking offense or both that receive criminal history points under the guidelines. A Career Offender's guidelines sentence ordinarily is required to be at or near the statutory maximum for his or her federal conviction. Source: https://www.ussc.gov/education/glossary

5 A statutory sentencing enhancement (See 18 U.S.C. § 924(e) and USSG §4B1.4) for a defendant convicted under 18 U.S.C. § 922(g) (prohibited person in possession of a firearm) who has at least three prior convictions for a "violent felony" or "serious drug offense" or both

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

of TARGET PHONES 1 thru 5, DAVID CHAVEZ was arrested and charged federally for felon in possession of a firearm.

53.     **EDNAMAY DELAROSA** is a BTL member and close friend of DAVID CHAVEZ. In fact, EDNAMAY DELAROSA was DAVID CHAVEZ' co-defendant in U.S. District Court Case No. Case No 14-CR-00748-JAP, in which EDNAMAY DELAROSA was convicted of possession with intent to distribute heroin. EDNAMAY DELAROSA completed her federal term of supervised release in 2018 and has no other felony convictions. At the time of the execution of search warrant 21MR719 and seizure of TARGET PHONES 6 and 7, four (4) firearms and about three pounds of marijuana were seized from her bedroom. DELAROSA was subsequently arrested and charged federally for felon in possession of a firearm.

54.     **ORLANDO ROYBAL, aka: "ORLIE,"** is a member of the BTL street gang. ORLANDO ROYBAL has at least 27 prior arrests in New Mexico with felony convictions for possession of a controlled substance (x3), aggravated battery with a deadly weapon, larceny, armed robbery with a deadly weapon, contributing to the delinquency of a minor, and being a felon in possession of a firearm. At the time of the seizure of TARGET PHONES 8, 9, 10, and 11 ORLANDO ROYBAL was serving a term of supervised release (TSR) under the supervision of the U.S. Probation Office in Albuquerque, Case No. 14-CR-1532-JB. The TSR stemmed from a 2014 conviction within the District of New Mexico for being a felon in possession of a firearm. The underlying firearm charge stems from an incident in which ORLANDO ROYBAL shot a man in the leg and fled from police. At the time of the execution of the search warrant and seizure of

---

committed on occasions different from one another. A defendant sentenced as an Armed Career Criminal faces a mandatory minimum prison term of 180 months. Source: https://www.ussc.gov/education/glossary

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

the TARGET PHONES 8-11, a dozen firearms, about three pounds of methamphetamine, distribution quantity of fentanyl, more than $10,000 in U.S. Currency, and hundreds of rounds of ammunition were located in his residence. ORLANDO ROYBAL was subsequently charged federally with possession of a firearm by a convicted felon, possession with intent to distribute methamphetamine, possession with intent to distribute fentanyl, and armed drug trafficking. I believe ORLANDO ROYBAL may be a "career offender" within the meaning set forth in the U.S. Sentencing Guidelines (USSG) (§4B1.1.) and may be subject to prosecution under the Armed Career Criminal Act (ACCA) if he is determined to be in possession of a firearm.

55.     **FRANK MADRID, aka: "BENZO,"** is a BTL associate and has at least 25 prior arrests in New Mexico with felony convictions for aggravated battery with a deadly weapon, attempted armed robbery with a deadly weapon and robbery (x4), possession of a controlled substance (x2) child abuse and attempt to commit a felony. I believe FRANK MADRID is a "career offender" within the meaning set forth in the U.S. Sentencing Guidelines (USSG) (§4B1.1.) and may be subject to prosecution under the Armed Career Criminal Act (ACCA) if he is determined to be in possession of a firearm. At the time of the seizure of TARGET PHONE 12, FRANK MADIRD was wanted on a U.S. District Court arrest warrant for being a felon in possession of a firearm, Case No.: 21-MJ-0716. In addition, at the time of his arrest and the seizure of the TARGET PHONE 13, FRANK MADRID was in possession two pistols, fentanyl, methamphetamine, heroin, and ammunition.

56.     **CHRISTOPHER PEREZ, aka: "LIL CHUCO," aka: "LIL CHRIS,"** is a BTL member and has at least five (5) arrests in New Mexico with a misdemeanor conviction for attempted possession of a controlled substance. CHRISTOPHER PEREZ is currently wanted on a U.S. District Court arrest warrant for violating his pretrial conditions of release in case no.: 20-cr-

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

2116 where he is charged with a violation of 18 U.S.C. §§ 922(g)(3) and 924, that being possession of a firearm and ammunition by a prohibited person, specifically a person who is an unlawful user of or addicted to any controlled substance. PEREZ was charged with these crimes on September 25, 2021, in cause number 20-MR-01639, and later by indictment in 20-cr-2116, and is the subject of an arrest warrant issued on December 18, 2020 in that case. There is also probable cause, contained herein, to believe that CHRISTOPHER PEREZ is aware of these charges.

57.     **ELIZABETH PEREZ, aka: "BREW TOWN QUEEN,"**  is a BTL member and has been arrested approximately seven (7) times for drug related offenses. ELIZABETH PEREZ was indicted in October 2020, for possession with intent to distribute cocaine, cause number 20-CR-1957. ELIZABETH PEREZ is currently serving a TSR under the supervision of the U.S. Probation Office in Albuquerque, case no.: 20CR1957. The underlying case stems from a September 2020 FBI search warrant of **Subject Premises A-5** wherein ELIZABETH PEREZ was charged federally with possession of cocaine with intent to distribute.

## DRUG DISTRIBUTION IN FURTHERANCE OF THE BTL CRIMINAL ENTERPRISE

58.     The BTL has historically generated income by distributing controlled substances, extorting weaker drug dealers, and participating in robberies and burglaries. Based on my training, experience, and familiarity with the BTL, I am aware that BTL members work together to dominate their neighborhood and exercise autonomy over their neighbors. Similarly, BTL members rely on one another to sell drugs, collect drug payments, and threaten or use violence against persons who fail to pay for drugs. For each of the activities described herein, I believe there is probable cause to believe BTL members and associates knew of the activities of others within the group, and the drug distribution schemes were heavily dependent on the reputation and strength of the BTL as an entire organization. Moreover, each scheme was intended to benefit all members

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

and associates within the enterprise. Some of the more recent and ongoing drug distribution conspiracies that furthered the BTL enterprise have been detailed herein.

59.      In the paragraphs that follow, I have detailed several controlled drug buys that occurred utilizing one or more CHS. In each of the controlled buys, the following protocols were exercised:

    a.  The CHS arranged the controlled buy with the Target Subject via cellular telephone contact (call, text, or a cellular enabled application such as Facebook, SnapChat, etc.);

    b.  The CHS was briefed on the operational objectives and safety considerations.

    c.  The CHS's person and vehicle (if a vehicle was used) were searched prior to meeting with the Target Subject;

    d.  The CHS was provided with official government funds to be utilized during the buy. If the CHS had any personal funds on them, agents secured it until after the buy;

    e.  The CHS was equipped with a covert audio/video recording device to utilize during the controlled buy, which was remotely controlled by an agent;

    f.  Surveillance was maintained on the CHS before, during, and after the controlled buy;

    g.  Agents met with the CHS following the controlled buy and recovered the drug evidence and recording device;

    h.  The CHS's person and vehicle (if a vehicle was used) were searched for contraband;

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

      i.   The controlled substances were tested via field test kits. In all of the referenced controlled purchases herein, the drugs tested positive.

## SCHEME 1: DRUG DISTRIBUTION ON THE STREETS OF ALBUQUERQUE

60.    **DAVID CHAVEZ, aka: "FLACO,"** is believed to be one of the principal drug distributors for the BTL. Despite the fact that DAVID CHAVEZ was released from federal prison in August 2018, and was serving a term of supervised release, case agents believe he has been a steady drug source of supply to the BTL and area drug users since at least the summer of 2019.

61.    During a 2019 FBI investigation of the Burqueños gang, FBI agents discovered DAVID CHAVEZ was connected to several Burqueño members and likely engaged in a drug distribution conspiracy with those subjects. Agents utilized an informant to make controlled drug buys from DAVID CHAVEZ.

62.    In July 2019, CHS-1 made a controlled purchase of a distribution quantity of heroin and methamphetamine from DAVID CHAVEZ at **Subject Premises A-1**.

63.    In August 2019, CHS-1 made a second controlled purchase of a distribution quantity of heroin and methamphetamine from DAVID CHAVEZ. This time, DAVID CHAVEZ met CHS-1 in a public place. DAVID CHAVEZ arrived at the deal in his Cadillac Escalade, bearing New Mexico license plate AMJH64. DAVID CHAVEZ was the only occupant in the vehicle and provided CHS-1 with the agreed upon quantity of drugs.

64.    During the summer of 2019, the FBI responded to the murder of a government witness in the SNM racketeering case and that matter took precedence over the Burqueños investigation. As such, the investigation into DAVID CHAVEZ was postponed.

65.    In early 2020, FBI agents and task force officers began looking into the criminal activities of the BTL based on CHS reporting indicating the BTL had an established drug

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

trafficking network in Albuquerque and were well armed. The investigation was further predicated based on jail intelligence concerning BTL members getting drugs into jail facilities, and the prior controlled drug buys from DAVID CHAVEZ.

66.     In March 2020, an unknown person shot BTL member CHRISTOPHER PEREZ, aka: "LIL CHUCO," aka "LIL CHRIS," in the leg. The shooting occurred within the 300 block of Aztec Road Northwest, Albuquerque, New Mexico, the same block where **Subject Premises A-5** is located. ELIZABETH PEREZ, aka: "BREW TOWN QUEEN" took CHRISTOPHER PEREZ to the hospital.

67.     In March 2020, Bernalillo County sheriff's detectives utilized a CHS to make a series of controlled drug buys from the residence of BTL member DOMINIC SOTO, aka: "SHADOW," and subsequently executed a search warrant on the premises. Detectives recovered two firearms, cocaine, methamphetamine, and heroin. DOMINIC SOTO was arrested and charged with possession of a controlled substance.

68.     In May 2020, BTL member ORLANDO ROYBAL, aka: "ORLIE," slapped and kicked a person for disrespecting him. ORLANDO ROYBAL received a criminal summons because of the incident.

69.     In June 2020, agents executed a search warrant on the residence of a BTL gang member for evidence of drug trafficking. The BTL member admitted to selling controlled substances but said law enforcement had recently stopped one of his drug clients leaving the gang member's house. The BTL member anticipated law enforcement would search his house, so he got rid of all his drugs and any evidence of drug trafficking.

70.     In June 2020, FBI agents observed BTL member ROBERT RIVERA, aka: "PEANUT," engaging in suspected drug transactions with multiple subjects. Agents knew

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

ROBERT RIVERA to be on intensive supervision with state parole officials and notified the New Mexico Department of Corrections. Parole officers subsequently conducted a search of ROBERT RIVERA and seized a firearm, ammunition, heroin, cocaine, and more than $5,000 in drug proceeds. Case agents charged ROBERT RIVERA with federal drug and firearm violations and he was subsequently convicted.

71.     Over the summer of 2020, case agents conducted surveillance on two known BTL houses, 308 and 312 Aztec Road (**Subject Premises A-5**) Northwest, Albuquerque, wherein multiple BTL members and associates were observed buying and selling drugs. When BTL members observed law enforcement surveillance, they would honk their horns, point out suspicious vehicles and discuss the fact that law enforcement was in the area.

72.     In August 2020, VICTIM-1 was a passenger in a vehicle and stopped at the intersection of Cedar Street Northeast and Roma Avenue Northeast, Albuquerque, New Mexico. A Hispanic adult male, with several tattoos, pulled up next to VICTIM-1 and shot into his vehicle several times. VICTIM-1 was struck in the back and arm. VICTIM-1 was transported to the hospital and survived the shooting. Law enforcement failed to develop any leads. CD-1 later told FBI agents that CD-1 was present for the shooting and identified DAVID CHAVEZ, aka: "FLACO," as the person who shot VICTIM-1. CD-1 said the shooting was drug related. The firearm utilized in that shooting was not recovered and I believe DAVID CHAVEZ may still have the weapon. I am aware DAVID CHAVEZ has a history of possessing firearms and has prior convictions for shooting at or from a motor vehicle and murder in the first degree. Counsel in an unrelated matter represents CD-1 and agents have been unable to persuade CD-1 to testify against DAVID CHAVEZ. VICTIM-1 is also reluctant to cooperate with law enforcement.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

73.     In August 2020, CHS-2 was present at a meeting in which BTL members discussed and met with Mexican cartel members in Albuquerque to obtain fentanyl M-30 tablets. After obtaining the fentanyl tablets, BTL members sold them on the street. CHS-2 reported the arrangement between the BTL and the cartel is on going and case agents are aware BTL members are currently selling fentanyl M-30 tablets.

74.     In August 2020, CHS-2 reported BTL member CHRISTOPHER PEREZ, aka: "CHUCO," was providing firearms to Mexican cartel members. The weapons were believed to be shipped to Mexico.

75.     In September 2020, BTL member DANIEL SILVA, aka: "JINX" and another BTL member were stopped by a BCSO deputy while in a vehicle. Deputies located a stolen firearm and various controlled substances, to include heroin, inside the car. DANIEL SILVA had more than $2,000 on his person. DANIEL SILVA was arrested and charged with five counts of trafficking a controlled substance and possession of a stolen firearm. FBI case agents subsequently adopted the state case and charged DANIEL SILVA with being a felon in possession of a firearm.

76.     In September 2020, CHS-2 was present at a meeting in which BTL member ALEJANDRO MOYA, aka: "ALEX," met with Mexican cartel members and arranged to get a bulk quantity of fentanyl M-30 tablets. ALEJANDRO MOYA requested CHS-2 sell for him (MOYA) and told CHS-2 that BTL member ORLANDO ROYBAL, aka: "ORLIE," sold for him (MOYA).

77.     In September 2020, two FBI Special Weapons and Tactics (SWAT) teams executed search warrants on the BTL houses located at 312 (**Subject Premises A-5**) and 308 Aztec Road NW, Albuquerque. Both houses had been under FBI surveillance over the summer and observed to be very active. Both houses contained several vehicles and outbuildings. SWAT agents

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

encountered BTL member ALEJANDRO MOYA, aka: "ALEX," in a BMW in the driveway with a spotlight, two loaded assault rifles with drum magazines and two loaded pistols were recovered from the vehicle. ALEJANDRO MOYA appeared to be serving in a security/over watch position; however, he had fallen asleep and awoke when SWAT agents broke the windows of the BMW and deployed flash-bang devices near the vehicle. ALEJANDRO MOYA and approximately a dozen other BTL members and associates were detained on the premises. Agents located distribution quantities of fentanyl M-30 tablets, cocaine, drug packaging material, six firearms, high-capacity magazines, hundreds of rounds of ammunition, three ballistic vests, numerous cell phones, drug paraphernalia, and nearly $8,000 in drug proceeds were seized. Several high-capacity magazines were located in the casita where BTL member SAN JUAN ARAGON, aka: "SPOOKY," lived.

78.     After the Aztec Road search warrants, BTL members CHRISTOPHER PEREZ, aka: "CHUCO," CHRISTOPHER MICHAEL PEREZ, aka: "LIL CHUCO," and ELIZABETH PEREZ, aka: "BREW TOWN QUEEN," were arrested and charged with federal drug and firearm violations. ERNESTO PEREZ and another BTL member were arrested on state drug charges.

79.     In September 2020, case agents obtained a federal arrest warrant for DOMINIC SOTO, aka: "SHADOW," based on laboratory findings that his DNA had been found on the firearm seized from his residence on March 11, 2020.

80.     In September 2020, CHS-2 conducted a controlled purchase of heroin from BTL associate MARTIN DURAN, aka: "WERO."

81.     In October 2020, CHS-2 conducted a controlled purchase of several fentanyl M-30 tablets from a BTL drug source of supply, who is a suspected Mexican cartel member. Agents identified the cartel member as JORGE OCHOA-PEREZ and developed information indicating he supplied other BTL members.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

82.     In October 2020, DOMINIC SOTO, aka: "SHADOW," was arrested on an outstanding FBI warrant and found to be in possession of a firearm. DOMINIC SOTO said he carried the pistol because he was a gang member and needed it for protection.

83.     In October 2020, a search warrant was executed on the residence and vehicle of BTL member NATHON COTINOLA, aka: "BONES." Agents seized more than a pound of methamphetamine, a loaded firearm, extended magazine, and ammunition. NATHON COTINOLA was charged federally

84.     In October 2020, FBI agents interviewed CD-1 who was an eyewitness to the August 2020 shooting of VICTIM-1. CD-1 said DAVID CHAVEZ shot VICTIM-1 because VICTIM-1 owed DAVID CHAVEZ money for drugs. The incident fits DAVID CHAVEZ' modus operandi, as he has prior felony convictions for drive by shooting, first degree murder, use of a firearm in furtherance of drug trafficking, and being a felon in possession of a firearm, among other crimes.

85.     In October 2020, CHS-2 conducted a second controlled purchase of several fentanyl M-30 tablets from cartel member JORGE OCHOA-PEREZ.

86.     In October 2020, DANIEL SILVA, aka: "JINX;" was arrested on an outstanding FBI warrant for being a felon in possession of a firearm, based on the firearm seized during the September 2020 traffic stop.

87.     In October 2020, a search warrant was executed at the residence of BTL associate MARTIN DURAN, aka: "Wero." Agents located heroin, methamphetamine, and ammunition in his residence, and he was subsequently charged with possession with intent to distribute methamphetamine and heroin, and being a felon in possession of ammunition.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

88.     In October 2020, ELIZABETH PEREZ, aka: "BREW TOWN QUEEN," was arrested on an outstanding FBI warrant for possession with intent to distribute cocaine. At the time of her arrest, officers located crack cocaine in her vehicle.

89.     In November 2020, officers arrested NATHON COTINOLA, aka: "BONES," pursuant to an FBI arrest warrant for possession with intent to distribute methamphetamine, being a felon in possession of a firearm, and possession of a firearm in furtherance of drug trafficking.

90.     In November 2020, FBI and DEA agents utilized CHS-2 and an undercover agent (UCA) to purchase a distribution quantity of fentanyl M-30 tablets from BTL drug supplier and suspected cartel member JORGE OCHOA-PEREZ.

91.     In November 2020, the FBI and DEA utilized the UCA to purchase a large quantity of fentanyl M-30 tablets from JORGE OCHOA-PEREZ.

92.     In November 2020, CHS-2 and CHS-3 made a controlled purchase of a distribution quantity of heroin from DAVID CHAVEZ, aka: "FLACO." DAVID CHAVEZ met CHS-2 and CHS-3 in a public place and drove his Cadillac Escalade (NM: AMJH64) to the meeting. DAVID CHAVEZ provided CHS-3 with the agreed upon quantity of heroin.

93.     On November 30, 2020, I obtained search warrants to search four cell phones seized during an FBI search warrant at 308 Aztec Road and 312 Aztec Road (**Subject Premises A-5**) Northwest, Albuquerque, New Mexico, (paragraph 77). The cell phones belonged to CHRISTOPHER PEREZ, aka: "CHUCO," ELIZABETH PEREZ, aka: "BREW TOWN QUEEN," ERNESTO PEREZ, and CHRISTOPHER MICHAEL PEREZ, aka: "LIL CHUCO," aka: "LIL CHRIS." The cell phones were examined and the contents of those phones included photographs of suspected narcotics, multiple conversations consistent with drug trafficking, hiding

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

spots for narcotics within the residence, BTL gang talk, and conversations about suspected law enforcement in the neighborhood.

94.    In December 2020, officers at the Cibola County Correctional Center located more than a dozen Suboxone stripes hidden within an envelope labeled "legal mail." The envelope was addressed to BTL member DANIEL SILVA, aka: "JINX," and the return address listed a location within the BTL's territory. Moreover, agents had observed DANIEL SILVA at the specific address just prior to his arrest in October 2020.

95.    In December 2020, U.S. Postal Inspectors advised FBI case agents that several BTL members were suspects in a series of armed robberies of mail carriers in Albuquerque. According to postal inspectors, BTL members had utilized firearms during the robberies.

96.    In January 2021, officers at the Cibola County Correctional Center located more than a dozen Suboxone stripes hidden within an envelope labeled "legal mail." The envelope was addressed to BTL member DANIEL SILVA, aka: "JINX." This was the second incident in which Suboxone strips had been addressed to DANIEL SILVA (paragraph 94 describes the first incident).

97.    In January 2021, FBI and DEA agents executed search warrants at the residence and stash house of BTL fentanyl supplier JORGE OCHOA-PEREZ. Agents arrested JORGE OCHOA-PEREZ and another subject, and seized $115,895, two firearms, two vehicles, cell phones, drug ledgers, 406 grams of cocaine, 348 grams of heroin, and 32 grams of fentanyl.

98.    In January 2021, during the course of monitoring jail calls at the Cibola County Correctional Center, case agents learned DANIEL SILVA and other BTL members had instructed a female associate to smuggle drugs into the facility.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

99.    In February 2021, the Albuquerque Metro Crime Stoppers organization received an anonymous tip reporting gang activity and shootings taking place at the residence of BTL member NATHAN COTINOLA, aka: "BONES." The tipster identified NATHAN COTINOLA by name and reported gang members were congregating at his residence, firing guns, unloading vehicles in a suspicious manner, and described multiple late-night visitors who appeared to be purchasing drugs from the residence.

100.    In February 2021, CD-3 told agents SAM ADAMS WILLIAMS was selling large quantities of methamphetamine, heroin, and fentanyl M-30 tablets with his girlfriend April Last Name Unknown (LNU) from his residence. CD-3 said he/she had purchased fentanyl M-30 tablets from SAM WILLIAMS more than 50 times over the past year. CD-3 knew SAM WILLIAMS to not only sell drugs, but SAM WILLIAMS and other subjects had committed home-invasion robberies of drug dealers to acquire free dope. CD-3 said SAM WILLIAMS had several firearms and provided drugs to members of the BTL, Westgate, and SNM gangs. CD-3 did not believe SAM WILLIAMS to be a gang member but said he had done prison time with many members of the SNM who had introduced SAM WILLIAMS to influential members of several of the Hispanic street gangs in the area. CD-3 indicated SAM WILLIAMS obtained the bulk of his drugs from BTL members, as he was selling within the BTL neighborhood. CD-3 explained SAM WILLIAMS would have to otherwise pay a tax for selling in the BTL neighborhood without the gang's permission.

101.    In March 2021, case agents located and arrested JOHNNY SAN JUAN ARAGON, aka: "SPOOKY," on an outstanding FBI warrant for being a felon in possession of a firearm and ammunition.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

102.    In March 2021, CHS-4 reported ORLANDO ROYBAL, aka: "ORLIE," and a female associate were selling drugs to a known SNM member. FBI agents subsequently executed a search warrant on the SNM member and arrested him with a distribution quantity of methamphetamine.

103.    In March 2021, case agents arrested NATHON CONTINOLA, aka: "BONES," pursuant to a warrant for federal pretrial violations. At the time of his arrest for pretrial violations, NATHON COTINOLA was found to be in possession of a loaded pistol, two high-capacity magazines, ammunition, and methamphetamine.

104.    In April 2021, BTL associate FRANK MADRID, aka: "BENZO," was stopped by law enforcement and discovered to be in possession of a firearm and distribution quantities of methamphetamine and heroin. CHS-6 recently reported FRANK MADRID maintained strong ties to Las Vegas, New Mexico, area. CHS-6 had worked with FRANK MADRID to obtain methamphetamine and heroin from BTL members and associates in Albuquerque and transport the drugs to the Las Vegas area. Gang members, like CHS-6, then obtained the drugs from FRANK MADRID and distributed them in and around Las Vegas.

105.    In April 2021, BTL suspected member EUSEBIO DEVARGAS was stopped on a bicycle a little after midnight by a BCSO patrol deputy within the BTL territory. EUSEBIO DEVARGAS initially tried to evade the deputy but was subsequently contacted a short distance later. EUSEBIO DEVARGAS told the deputy he had a pistol on his person and he was detained. Deputies queried EUSEBIO DEVARGAS and learned he had several prior felony convictions, to include a homicide conviction. CHS-4 is a close associate of EUSEBIO DEVARGAS and advised EUSEBIO DEVARGAS was a BTL member and heroin addict. CHS-4 said EUSEBIO DEVARGAS served as a lookout for various BTL dealers, who paid EUSEBIO DEVARGAS in

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

dope. CHS-4 said the night EUSEBIO DEVARGAS was arrested, he had been working as a lookout for the BTL and led the deputy away from a BTL drug house before submitting to arrest.

106.     In April 2021, case agents observed a member of the BTL, within the BTL controlled territory in Albuquerque. The member had previously been deported to Mexico after being convicted of a violent felony. Agents were aware the BTL member was a witness in a gang related homicide and sought a federal warrant for illegal re-entry by a previously deported violent felon. Case agents obtained the warrant and arrested the BTL member on May 6, 2021.

107.     In early May 2021, case agents interviewed CD-4 about the BTL. CD-4 has been a member of the BTL for approximately 20 years. CD-4 confirmed the BTL were primarily a drug dealing organization that protected their enterprise with firearms and violence. CD-4 provided substantial information on the gang and several of the members, to include an eyewitness account of a 2017 cold-case homicide in which a BTL member murdered a person on the street within the BTL territory.

108.     CD-4 described BTL member ORLANDO ROYBAL, aka: "ORLIE," to be a well-respected BTL member who sold large quantities of methamphetamine, heroin, and fentanyl M-30 tablets. CD-4 knew ORLANDO ROYBAL to pick up 3,000-4,000 fentanyl M-30 tablets every two days from members of the Juarez Cartel. CD-4 said ORLANDO ROYBAL sold the M-30 tablets for $8 per pill. CD-4 provided specific details on ORLANDO ROYBAL's residence (**Subject Premises A-3**), vehicles, and the transportation route(s) used by the Juarez Cartel to get the drugs to ORLANDO ROYBAL and other members of the BTL.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

109.      On May 10, 2021, FBI VCGTF agents conducted surveillance on DAVID CHAVEZ, aka: "FLACO," and EDNAMAY DELAROSA.[6] The two subjects were together most of the day and traveled in DAVID CHAVEZ' blue Cadillac Escalade, New Mexico license AMJH64. Agents observed DAVID CHAVEZ and EDNAMAY DELAROSA participate in three suspected drug transactions.

    a.   The first transaction occurred at approximately 2:50 p.m. DAVID CHAVEZ and EDNAMAY DELAROSA met an unknown female at the Laguna Burger on 12th Street Northwest. The female got into the back of the Cadillac Escalade and remained for approximately 2 minutes before returning to her vehicle. Both vehicles then departed the parking lot. DAVID CHAVEZ and EDNAMAY DELAROSA then traveled to DAVID CHAVEZ' residence (**Subject Premises A-1**).

    b.   The second transaction occurred at approximately 5:21 p.m. DAVID CHAVEZ and EDNAMAY DELAROSA met a Hispanic male adult at a Burger King on Rio Grande Boulevard NW. The male got into the back of the Cadillac Escalade and DAVID CHAVEZ drove the male to a nearby Jiffy Lube store. The male then emerged from the Escalade with a backpack. The male walked away from the location and DAVID CHAVEZ and EDNAMAY DELAROSA drove to another meeting.

---

[6] DAVID CHAVEZ, aka: "FLACO," and EDNAMAY DELAROSA are friends and were co-defendants in U.S. District Court Case No. Case No 14-CR-00748-JAP, in which both subjects were convicted of heroin trafficking. DAVID CHAVEZ was also convicted of firearms violations in that matter.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

c.  The third transaction occurred at approximately 5:49 p.m. DAVID CHAVEZ
and EDNAMAY DELAROSA met an unknown subject in the parking lot of a
Dollar General store on Central Avenue Southeast. DAVID CHAVEZ parked
next to another vehicle, briefly exited the Escalade, conducted a hand-to-hand
transaction with the driver of the other vehicle, and returned to the Escalade.
Both vehicles then departed the parking lot. DAVID CHAVEZ and EDNAMAY
DELAROSA then drove to EDNAMAY DELAROSAs' residence (**Subject
Premises A-2**) and remained for the rest of the evening.

110.    I believe each of the aforementioned meetings between DAVID CHAVEZ,
EDNAMAY DE LA ROSA and the other persons were consistent with drug transactions.

111.    On May 11, 2021, VCGTF personnel conducted surveillance on DAVID CHAVEZ
and EDNAMAY DELAROSA. At approximately 2:00 p.m., agents observed DAVID CHAVEZ
depart **Subject Premises A-2** in EDNAMAY DELAROSA's Chevrolet Impala, New Mexico
license AMPN45. DAVID CHAVEZ drove to the Atrisco Plaza on Central Avenue Northwest and
parked next to an occupied vehicle. The driver of the other vehicle got into the Impala with DAVID
CHAVEZ and the two subjects briefly interacted. The male then exited the Impala and returned to
his vehicle. DAVID CHAVEZ departed the location and went to his residence (**Subject Premises
A-1**). VCGTF and APD Gang Unit detectives maintained surveillance on the person that met with
DAVID CHAVEZ and initiated a traffic stop on the unwitting person (hereinafter "Unwitting-1").
Case agents searched Unwitting-1 and located an amount of fentanyl M-30 tablets on Unwitting-
1. Case agents seized the controlled substances. Unwitting-1 admitted he had just purchased the
fentanyl tablets from "a guy," but refused to provide the name of the person who sold him the
drugs. Unwitting-1 said he could not provide information on his drug source because "he's the real

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

deal" and would kill Unwitting-1 if Unwitting-1 talked. Unwitting-1 was released from the scene pending further investigation.

112.    CHS-3 later reported to agents that Unwitting-1 told DAVID CHAVEZ, aka: "FLACO," about the encounter with gang detectives and DAVID CHAVEZ was nervous because he thought the "feds" might be on to him.

113.    On May 13, 2021, CHS-3 made a controlled purchase of a distribution quantity of fentanyl M-30 tablets from BTL member ORLANDO ROYBAL, aka: "ORLIE." Prior to the controlled buy, agents observed ORLANDO ROYBAL depart his residence (**Subject Premises A-3**). ORLANDO ROYBAL then traveled to a predetermined location and sold the fentanyl M-30 tablets to CHS-3.

114.    During the week of May 27, CHS-7 visited with SAM ADAMS WILLIAMS at his residence and observed two firearms within the residence.

115.    During the week of May 27, 2021, CHS-5 communicated with EDNAMAY DELAROSA regarding the purchase of controlled substances. EDNAMAY DELAROSA told CHS-5 that she (DELAROSA) had clear (methamphetamine), black (heroin) and blues (fentanyl M-30 tablets) and provided prices. EDNAMAY DELAROSA told CHS-5 to contact her whenever CHS-5 needed them.

116.    During the week of May 27, 2021, CHS-3 communicated with DAVID CHAVEZ, aka: "FLACO," regarding the purchase of heroin and fentanyl M-30 tablets. DAVID CHAVEZ told CHS-3 that he (CHAVEZ) had the drugs and they could meet up whenever.

117.    During the week of May 27, 2021, CHS-4 communicated with ORLANDO ROYBAL, aka: "ORLIE," regarding the purchase of controlled substances. ORLANDO ROYBAL told CHS-4 to come by **Subject Premises A-3** whenever CHS-4 was ready.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

118.    On May 28, 2021, officers at the Cibola County Correctional Center responded to a group fight in a federal holding cell between USMS inmates. One of the offending inmates was JOHNNY SAN JUAN ARAGON, aka: "SPOOKY." The group fight is consistent with drug trafficking behavior within the facility.

119.    On June 1, 2021, agents observed an individual who appeared to be DAVID CHAVEZ outside of **Subject Premises A-2** as well as DAVID CHAVEZ' blue Cadillac Escalade, New Mexico license AMJH64.

120.    On June 2, 2021, the FBI executed seven (7) residential search warrants for BTL gang members and associates. Agents located twenty firearms, about three pounds of methamphetamine, heroin, loaded needles, distribution quantities of blue tablets marked M30 and believed to contain fentanyl, heroin, bulk U.S. Currency, suppressor, extended and drum style magazines, and hundreds of rounds of ammunition. Following the search warrants, ORLANDO ROYBAL, DAVID CHAVEZ, EDNAMAY DELAROSA, FRANK MADRID, SAM ADAMS WILLIAMS, and EUSEBIO DEVARGAS were arrested and charged federally with drug and gun violations. The TARGET PHONES were seized during this operation, however fugitive CHRISTOPHER PEREZ was not located at **Subject Premises A-5**.

121.    During the month of June 2021, and following the above referenced search warrants, CHS-3 advised me that they knew CHRISTOPHER MICHAEL PEREZ, aka: "LIL CHUCO," was staying at **Subject Premises A-5** before June 2, 2021. CHRISTOPHER MICHAEL PEREZ also knew that he was wanted, hiding out from law enforcement, and his mother ELIZABETH PEREZ was letting him stay with her at **Subject Premises A-5**. The day before law enforcement executed the search warrant at **Subject Premises A-5** CHRISTOPHER MICHAEL PEREZ observed subjects he believed to be law enforcement and fled the area.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

122.    On June 24, 2021, CHS-1 reported that they knew ELIZABETH PEREZ, aka:

"BREW TOWN QUEEN," had never stopped selling narcotics, even though she had been arrested

and was recently released from jail. CHS-1 advised that ELIZABETH PEREZ was still selling

narcotics from **Subject Premises A-5** and knew there to be heavy traffic coming and going from

the residence, as well as very expensive vehicles at the residence. CHS-1 also stated that

CHRISTOPHER PEREZ, aka: "CHUCO" was still running things from jail, selling drugs from

his house at 308 Aztec Road Northwest, Albuquerque, located two doors down from **Subject**

**Premises A-5**, and with his mom ELIZABETH PEREZ.

123.    On July 19, 2021, CD-5 advised agents that they knew BTL members ELIZABETH

PEREZ, NIKI LNU, and ERNESTO PEREZ to sell and use narcotics from **Subject Premises A-**

**5**. According to CD-5, ELIZABETH PEREZ had direct connections to Paisas[7] and would provide

narcotics to NIKI LNU, who would then provide the narcotics to DAVID CHAVEZ. Further, CD-

5 believed NIKI LNU would collect payment for ELIZABETH PEREZ. Within the last few weeks,

CD-5 indicated that DAVID CHAVEZ thought that the heat was on and the feds were on to him,

so he had been laying low. During the weeks leading up to his arrest on June 2, 2021, in an effort

to lay low, DAVID CHAVEZ let NIKI LNU run his drug trafficking operation. CD-5 looked at a

Facebook profile for NIKI LNU and identified her as using the screen name "NICOLE

RESENDIZ."

---

[7] I know the term "paisa" or "paisano" to be a slang term referring to a non-gang affiliated
person from Mexico. In U.S. prisons, the Paisas are a loosely affiliated group, without ties to
organized gangs, who band together for protection. In drug subculture, street dealers often refer to
their "Mexican connect" or Mexico-based source of supply as being "cartel" or "a paisa."

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

### Scheme 2: Drug Distribution within the Cibola County Correctional Center

124.     BTL    members    CHRISTOPHER    PEREZ,    aka:    "CHUCO,"    NATHON

CONTINOLA, aka: "BONES," ROBERT RIVERA, aka: "PEANUT," DANIEL SILVA, aka:

"JINX," DOMINIC SOTO, aka: "SHADOW," MARTIN DURAN, aka: "WERO," JOHNNY

SAN JUAN ARAGON, aka: "SPOOKY," DAVID CHAVEZ, aka: "FLACO," ORLANDO

ROYBAL, aka: "ORLIE," FRANK MADRID, aka: "BENZO," and EUSEBIO DEVARGAS are

currently incarcerated at the Cibola County Correctional Center in Milan, New Mexico. All of the

aforementioned defendants are USMS inmates and being housed in the federal wing of the facility.

The federal wing, or holding pods, contain USMS inmates awaiting trial, serving time on

supervised release violations, or U.S. Bureau of Prisons inmates in custody for violating their BOP

prerelease.

125.     I am aware numerous inmates have been able to smuggle various controlled

substances and cellular telephones into the Cibola County Correctional Center in recent months.

The problem seems to be most pervasive in the federal wing of the facility, as I believe the federal

inmates are more experienced in the means and methods of drug trafficking within jails and

prisons.

126.     CD-2, CD-3, CHS-4, CHS-5, CHS-7 all reported the BTL members at the Cibola

County Correctional Center were involved in drug trafficking within the facility. More

specifically, CD-2, CD-3, CHS-4, and CHS-5 all reported or described an alliance between

members of the SNM, BTL, and Paisas to smuggle fentanyl tablets and Suboxone strips into the

facility. CD-2 explained the drugs sold for ten times as much as the same drugs would on the street

because it was so difficult to smuggle them into the jail. CD-3 said the drugs were being introduced

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

almost exclusively through fake "legal mail" because in-person visits had been suspended due to Covid restrictions.

127.    FBI agents executed a search warrant on CD-3's residence several months ago in relation to CD-3's efforts to smuggle drugs into the jail. CD-3 is currently facing federal drug and firearm charges. CD-3 identified SAM ADAMS WILLIAMS as CD-3's drug source of supply and knew SAM ADAMS WILLIAMS and his girlfriend to ship drugs to inmates within area jails and prisons.

128.    CHS-4 and CHS-5 reported much of the drugs were making it into the facilities via the mail, but also conveyed corrupt jail staff were smuggling the drugs into the facility. I am aware at least two staff members have been arrested in recent months for bringing drugs into the jail.

129.    CHS-4 said DANIEL SILVA, aka: "JINX," and DOMINIC SOTO, aka: "SHADOW," were working with SNM members and Paisas to get weekly "packages" of Suboxone and methamphetamine into the Cibola County Correctional Center.

130.    During the two week period before May 27, 2021, CHS-4 was contacted by an SNM member who requested CHS-4 and another person mail Suboxone strips to several people within the Cibola County Correctional Center.

131.    During the week leading up to May 27, 2021, CHS-4 followed-up with the SNM member (at the FBI's direction) and learned another individual had turned himself in on a federal probation violation and successfully smuggled drugs into the Cibola County Correctional Center.

132.    Case agents are presently monitoring the jail calls of several BTL members incarcerated at the Cibola County Correctional Center and have observed DANIEL SILVA, aka: "JINX," and DOMINIC SOTO, aka: "SHADOW," speak with other BTL members or associates

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

about sending drugs into the facility. During other conversations, BTL members discussed a 2001 cold case homicide investigation that is believed to have occurred within the BTL neighborhood.

133.    While I am not requesting to search any of the inmates at the Cibola County Correctional Center, I have sought to document some of the drug distribution activities therein and believe that evidence of such drug trafficking activities may be contained on the TARGET PHONES.

134.    Following the execution of the seven search warrants on June 2, 2021, DAVID CHAVEZ, EDNAMAY DELAROSA, ORLANDO ROYBAL, and FRANK MADRID were located at and arrested from locations A-1, A-2, A-3, and A-4, the specifics of those arrests are outlined below.

## SEARCH OF SUBJECT PREMISES A-1, A-2
## ARREST OF DAVID CHAVEZ AND EDNAMAY DELAROSA

135.    On June 2, 2021, members of the FBI, Albuquerque Police Department, and Bernalillo County Sheriff's Office, executed federal search warrants issued by the Honorable United States Magistrate Judge Jerry H. Ritter at **Subject Premises A-1** (21-MR-718) and **Subject Premises A-2** (21-MR-719).

136.    The search warrant for DAVID CHAVEZ' residence, **Subject Premises A-1**, authorized agents to search the premises for evidence related to violations of: 18 U.S.C. §§ 1962(c) and (d), that being Racketeer Influenced and Corrupt Organizations (RICO) Act and RICO Act Conspiracy; 18 U.S.C. § 924(c), that being use of a firearm in furtherance of a drug trafficking crime; 18 U.S.C. §§ 922(g), that being a prohibited person in possession of a firearm or ammunition; 21 U.S.C. §§ 841(a)(1) and 846, that being possession with intent to distribute

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

controlled substances and conspiracy to distribute; and 21 U.S.C. § 856, that being maintaining drug-involved premises (21-MR-718).

137.     The search warrant for EDNAMAY DELAROSA's residence, **Subject Premises A-2**, authorized agents to search the premises for evidence related to violations of: 18 U.S.C. §§ 1962(c) and (d), that being Racketeer Influenced and Corrupt Organizations (RICO) Act and RICO Act Conspiracy; 18 U.S.C. § 924(c), that being use of a firearm in furtherance of a drug trafficking crime; 18 U.S.C. §§ 922(g), that being a prohibited person in possession of a firearm or ammunition; 21 U.S.C. §§ 841(a)(1) and 846, that being possession with intent to distribute controlled substances and conspiracy to distribute; and 21 U.S.C. § 856, that being maintaining drug-involved premises (21-MR-719).

138.     DAVID CHAVEZ was present at **Subject Premises A-1**, which is his residence of record with the U.S. Probation Office and EDNAMAY DELAROSA was present at **Subject Premises A-2**, which is the residence listed on her current New Mexico driver's license.

139.     At approximately 0600 hours, an FBI SWAT team executed search warrant 21MR718, at **Subject Premises A-1**. While the SWAT team was executing the search warrant and before DAVID CHAVEZ was detained, DAVID CHAVEZ was observed moving throughout the residence. Specifically, DAVID CHAVEZ went from his bedroom to the bathroom with a black bag and he walked elsewhere throughout the house. Agents believe DAVID CHAVEZ flushed narcotics, concealed evidence, and moved phones before being detained. Pursuant to the search warrant, several items were seized from **Subject Premises A-1**, including but not limited to:

        a.   A sum of United States currency, located in a black bag;

        b.   Drug packaging material and scale, located next to item 139a;

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

    c.   Rifle ammunition;

    d.   TARGET PHONE 1, located in CHAVEZ's bedroom;

    e.   TARGET PHONE 2, located in CHAVEZ mother's bedroom;

    f.   TARGET PHONE 3, located in CHAVEZ' mother's bedroom concealed under her bed;

    g.   TARGET PHONE 4, located in CHAVEZ' bedroom;

    h.   TARGET PHONE 5, located in CHAVEZ' mother's bedroom;

    i.   Seven other phones, which were broken or believed to belong to someone other than DAVID CHAVEZ.

140.    Pursuant to search warrant 21-MR-719, several items were seized from **Subject Premises A-2**, including but not limited to:

    a.   An AR-15 rifle, located in DELAROSA's bedroom;

    b.   A 12-gauge shotgun, located in DELAROSA's bedroom;

    c.   A Glock handgun, located in a black bag in DELAROSA's bedroom;

    d.   A Raven Arms handgun, located in DELAROSA's bedroom;

    e.   Two black and silver boxes containing several pounds of suspected marijuana, located in DELAROSA's bedroom;

    f.   A suppressor, drum magazine, firearm magazines, and ammunition, also located in DELAROSA's bedroom;

    g.   TARGET PHONE 6, located in DELAROSA's bedroom;

    h.   TARGET PHONE 7, located in DELAROSA's bedroom.

141.    During the search, agents observed additional indicia of DAVID CHAVEZ' presence at **Subject Premises A-2**. DAVID CHAVEZ's blue Cadillac Escalade, NM tag

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

AMJH64, was parked in the driveway of **Subject Premises A-2**. A letter addressed to DAVID CHAVEZ along with vehicle insurance in DAVID CHAVEZ' name were located in EDNAMAY DE LA ROSA's bedroom with the items listed above. Finally, a receipt for jewelry with DAVID CHAVEZ' name on it, located in the nightstand next to item 140(d).

142.     DAVID CHAVEZ agreed to speak with agents without an attorney present. DAVID CHAVEZ stated he was a convicted felon and knew he was prohibited from possessing firearms. He admitted to possessing three guns at **Subject Premises A-2**, specifically a shotgun (item 140(b) above), a Glock (item 140(c) above), and a small pistol (item 140(d) above). He claimed that he gave them to EDNAMAY DELAROSA a few months ago and further stated that the Glock was in a black bag. DAVID CHAVEZ also told investigators that he hid his phone (TARGET PHONE 3) under his mother's mattress after seeing agents at his window. Agents located TARGET PHONE 3 under the mattress, confirming what DAVID CHAVEZ told agents. Based on CHAVEZ' movements inside **Subject Premises A-2** directly prior to the search warrant entry, CHAVEZ' statements about TARGET PHONE 3, and my training and experience relating to drug traffickers possessing multiple phones, I believe the phones locate din CHAVEZ' mother's room belong to CHAVEZ.

143.     EDNAMAY DELAROSA agreed to speak with agents without an attorney present. EDNAMAY DELAROSA stated she was a convicted felon and knew she was prohibited from possessing firearms. Of the four guns in the house, EDNAMAY DELAROSA claimed that the semi-automatic assault style AR-15 rifle (item 140(a) above) belonged to her and the small pistol (item 140(d)) she took from a friend for protection.

144.     DAVID CHAVEZ and EDNAMAY DELAROSA were subsequently arrested and charged via criminal complaint with violations of 18 U.S.C. §§ 922(g)(1) and 924 that being a

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

felon in possession of a firearm and ammunition, cause numbers 21MJ755 and 21MJ755. Both

subjects were indicted for the same offense on June 23, 2021, cause number 21-864JB

### SEARCH OF LOCATION A-3
### ARREST OF ORLANDO ROYBAL

145.     On June 2, 2021, members of the FBI and New Mexico State Police executed

a federal search warrant issued by the Honorable United States Magistrate Judge Jerry H.

Ritter at **Subject Premises A-3** (21-MR-721), ORLANDO ROYBAL's residence. The search

warrant authorized agents to search the premises for evidence related to violations of: 18 U.S.C.

§§ 1962(c) and (d), that being Racketeer Influenced and Corrupt Organizations (RICO) Act and

RICO Act Conspiracy; 18 U.S.C. § 924(c), that being use of a firearm in furtherance of a drug

trafficking crime; 18 U.S.C. §§ 922(g), that being a prohibited person in possession of a firearm

or ammunition; 21 U.S.C. §§ 841(a)(1) and 846, that being possession with intent to distribute

controlled substances and conspiracy to distribute; and 21 U.S.C. § 856, that being maintaining

drug-involved premises.

146.     At approximately 0600 hours, agents knocked loudly on the door and shouted FBI

with a search warrant several times. A marked NMSP vehicle, in the parking lot below the

apartment, activated its emergency lights and blared the siren numerous times. After waiting

approximately 15-20 seconds, agents attempted to breach the door with a ram. The door was

reinforced and a person, believed to be ORLANDO ROYBAL, applied counter pressure to the

backside of the door to keep it closed. With each impact of the ram, the door opened 6-9 inches

and then closed again. This process repeated for approximately 1-2 minutes, as three different

agents rotated into the breacher role. Agents continued shouting FBI with a search warrant

throughout the process.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

147.     Once agents determined the locking mechanisms had broken free from the door, as had much of the doorframe, agents pushed the door open about halfway and observed ORLANDO ROYBAL standing behind the door. He initially ignored agent's orders to raise his hands and step outside, instead he moved to the left of the front door and partially into a bedroom. It was not until Task Force Officers pointed Tasers at ORLANDO ROYBAL and advised him he would be Tased if he failed to raise his hands and step outside. ORLANDO ROYBAL complied and stepped outside, at which time he was placed in handcuffs and escorted downstairs. An adult female then exited the bedroom next to the front door. Agents entered the apartment and observed five firearms in the bedroom ORLANDO ROYBAL and the female had been in.

148.     ORLANDO ROYBAL agreed to speak with agents without a lawyer present and said that agents would find several firearms, a couple pounds of methamphetamine, and some cash in his bedroom. ORLANDO ROYBAL acknowledged he could not possess firearms because he was a felon and he believed he was facing 15 years in prison for having the guns. ORLANDO ROYBAL unlocked his cellular telephones when requested and provided the combination to a safe located in his closet. ROYBAL said agents would find about two pounds of meth inside the safe, which was accurate.

149.     ROYBAL admitted to being a member of the BTL gang, although he said he had moved out of the neighborhood and didn't gangbang anymore. When questioned about the firearms, ROYBAL admitted his fingerprints and DNA would be on the guns because he moved them around a bit. ROYBAL said he was keeping the guns for another person, but declined to elaborate or provide the names of any other persons. Similarly, ROYBAL said the apartment belonged to a friend, but he (ROYBAL) had been staying in the apartment for a couple months.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

ROYBAL said his friend (the apartment renter) had not been around in a while. ROYBAL said he earned money through legitimate employment as a contractor and via Covid stimulus payments.

150.    When questioned about the drugs in the apartment, specifically about three pounds of methamphetamine and 40-50 fentanyl M-30 tablets, ROYBAL admitted the drugs were his. The quantities of the above are, in my training and experience, inconsistent with personal use and indicative of possession with the intent to distribute. ROYBAL said he distributed drugs, but did not really sell them or make money off the sale of drugs. ROYBAL explained he held the drugs for other people until they could pick them up. ROYBAL emphatically said all the drugs, firearms, and ammunition belonged to him and none of those items belonged to his female associate, who had only been staying with him for about a week. The female was interviewed and denied ownership of any of the firearms and acknowledged she was a drug user and could not possess a gun.

151.    During the search of the one-bedroom apartment, agents located and seized the following items of contraband (all measurements and weights are approximate):

    a.    2.9 pounds of suspected methamphetamine;

    b.    41 blue tablets marked M30 and believed to contain fentanyl;

    c.    2 grams of suspected heroin;

    d.    Approximately $10,000 in U.S. currency;

    e.    Four AR-15 rifles, one of which is a short-barrel rifle;

    f.    One short barrel 12-gauge shotgun;

    g.    One open-bolt style machinegun;

    h.    Four handguns;

    i.    One AK-47 rifle;

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

j.   One Kel-Tec folding rifle;

k.   Dozens of hi-capacity rifle and pistol magazines;

l.   1000+ cartridges of various caliber ammunition;

m.   TARGET PHONE 8, located in ROYBAL's bedroom;

n.   TARGET PHONE 9, located in ROYBAL's bedroom;

o.   TARGET PHONE 10, located in ROYBAL's bedroom;

p.   TARGET PHONE 11, located in ROYBAL's bedroom;

152.    The currency was located in the pocket of ORLANDO ROYBAL's pants and in his wallet. The pants were located on the bedroom floor and the wallet on the bed. The suspected methamphetamine and heroin tested positive via field-testing.

153.    Following the search of the premises, ORLANDO ROYBAL was booked into the custody of the U.S. Marshals Service for being in violation of the terms of his supervised release (14-CR-01532-JB).

154.    On June 3, 2021, the Honorable United States Magistrate Judge Laura Fashing authorized an arrest warrant and criminal complaint charging ORLANDO ROYBAL, aka: "ORLIE," with the below violations, cause number 21MJ752LF. On June 23, 2021, a federal grand jury issued an indictment and arrest warrant, cause number 21-863JH, charging ORLANDO ROYBAL with the following violations of the United States Code:

a.   21 U.S.C. §§ 841(a)(1) and (b)(1)(A): possession with intent to distribute 500 grams or more of a mixture and substance containing methamphetamine;

b.   21 U.S.C. §§ 841(a)(1) and (b)(1)(C): possession with intent to distribute fentanyl;

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

c.  18 U.S.C. § 924(c)(1)(A)(i): using and carrying a firearm during and in relation to a drug-trafficking crime, and possessing a firearm in furtherance of such crime;

d.  18 U.S.C. §§ 922(g)(1) and 924: being a felon in possession of a firearm and ammunition.

### SEARCH OF SUBJECT PREMISES A-4
### ARREST OF FRANK MADRID

155.    On June 2, 2021, members of the FBI, DEA, BCSO, and APD executed a federal search warrant issued by the Honorable United States Magistrate Judge Jerry H. Ritter at **Subject Premises A-4** (21-MR-723) FRANK MADRID's residence. The search warrant authorized agents to search the premises for evidence related to violations of: 18 U.S.C. §§ 1962(c) and (d), that being Racketeer Influenced and Corrupt Organizations (RICO) Act and RICO Act Conspiracy; 18 U.S.C. § 924(c), that being use of a firearm in furtherance of a drug trafficking crime; 18 U.S.C. §§ 922(g), that being a prohibited person in possession of a firearm or ammunition; 21 U.S.C. §§ 841(a)(1) and 846, that being possession with intent to distribute controlled substances and conspiracy to distribute; and 21 U.S.C. § 856, that being maintaining drug-involved premises.

156.    At approximately 0600 hours, agents knocked on the front door of the **Subject Premises A-4**, loudly and clearly announced their presence, and announced they were executing a search warrant. While loudly knocking and announcing their presence, the subject(s) at the residence failed to open the front door, or exit the residence. Agents and officers then breached the security door, and then the front door, again loudly and clearly announced their presence, and specifically directed the subject, FRANK MADRID, to show himself with his hands up.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

157.     Following a significant delay, FRANK MADRID eventually appeared with his hands in view; however, he was holding a recently lit cigarette in this left hand. Additionally, a female subject holding a one-year old child also exited. FRANK MADRID was then handcuffed and escorted away from the residence.

158.     FRANK MADRID later agreed to speak with agents without an attorney present and stated that he sold heroin to support his own drug habit. He said he knew he was a convicted felon and therefore was not allowed to possess a firearm, but said that the guns did belong to him.

159.     Pursuant to the search warrant, agents seized the below items from FRANK MADRID's bedroom:

    a.   One Ruger revolver, with ammunition;

    b.   One Smith and Wesson handgun, with ammunition;

    c.   Six (6) small yellow baggies each containing ten (10) blue tablets marked M30, for a total 60 tablets, believed to contain fentanyl;

    d.   Black tar like substance, that field tested presumptively positive for heroin, seized weight of 3.6 grams;

    e.   Three (3) loaded syringes, containing suspected heroin;

    f.   White crystalline substance that field tested presumptively positive for methamphetamine, seized weight of 9.0 grams;

    g.   White powder substance that field tested presumptively positive for the presence of heroin, seized weight of 6.2 grams;

    h.   Three (3) scales;

    i.   TARGET PHONE 12.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

160.     Pursuant to the outstanding federal arrest warrant for felon in possession of a firearm and ammunition, cause number 21MJ716, FRANK MADRID was transported directly to the United States Court House located in Albuquerque, NM and transferred to the custody of the USMS.

## SEARCH OF SUBJECT PREMISES A-5

161.     On June 2, 2021, members of the FBI and USMS executed a federal search warrant issued by the Honorable United States Magistrate Judge Jerry H. Ritter at **Subject Premises A-5** (21-MR-724). The search warrant authorized agents to search the premises for evidence related to violations of: 18 U.S.C. §§ 1962(c) and (d), that being Racketeer Influenced and Corrupt Organizations (RICO) Act and RICO Act Conspiracy; 18 U.S.C. § 924(c), that being use of a firearm in furtherance of a drug trafficking crime; 18 U.S.C. §§ 922(g), that being a prohibited person in possession of a firearm or ammunition; 21 U.S.C. §§ 841(a)(1) and 846, that being possession with intent to distribute controlled substances and conspiracy to distribute; and 21 U.S.C. § 856, that being maintaining drug-involved premises.

162.     At approximately 0600 hours, agents executed the search warrant and located ELIZABETH PEREZ, ERNESTO PEREZ, and NICOLE RESENDIZ. The following items were located at the residence:

    a.   Shotgun ammunition;

    b.   .22 ammunition;

    c.   Brew Town Locos dash mat;

    d.   9mm PAK shell casing;

    e.   Loaded syringes, containing suspected heroin;

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

     f.   TARGET PHONE 13, located in CHRISTOPHER M. PEREZ's bedroom;

     g.   TARGET PHONE 14, located in the common living room;

     h.   TARGET PHONE 15, located in ERNESTO PEREZ's bedroom;

     i.   TARGET PHONE 16, located in ELIZABETH PEREZ's bedroom;

     j.   TARGET PHONE 17, located in the common living room.

## TECHNICAL TERMS

163.    Based on my training and experience, I use the following technical terms to convey the following meanings:

164.    Cellular telephone: A cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "land line" telephones. A cellular telephone usually includes a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cellular telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.

165.    Digital camera: A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

166.    Portable media player: A portable media player (or "MP3" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

167.    GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

168.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as a wireless communication device and are used to access the Internet and send and receive email. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

169.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of numbers separated by periods (e.g., 121.56.97.178). Every device attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some devices have static – tat is, long-term – IP addresses, while other computers have dynamic – that is, frequently changed – IP addresses.

170.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

171.     Based on my experience, I know that the TARGET PHONES have the capability to serve as a wireless telephone, digital camera, portable media player, GPS navigation device,

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

and PDA. In my experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

172.    Based on my knowledge and experience, I know that electronic devices can store information for long periods of time. This information can sometimes be recovered with forensic tools.

173.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET PHONES were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET PHONES because:

174.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

175.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

176.    A person with appropriate familiarity with how electronic devices and electronically stored information work may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices and electronically stored information were used, the purpose of their use, who used them, and when.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

177.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. For example, whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

178.     Further, in finding evidence of how a device and electronically stored information were used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

179.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Phone consistent with the warrant. The examination may require authorities to employ specialized techniques, including but not limited to computer-assisted analyses, that might expose many parts of the Account to human inspection in order to determine whether it is evidence described by the warrant.

180.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

## CONCLUSION

181.     Based on the information contained herein, I submit there is probable cause for a search warrant authorizing the examination of the TARGET PHONES described in Attachment A to seek the items described in Attachment B for evidence pertaining to violations of 18 U.S.C. §§ 1962(c), (d), 924(c), 922(g) and 924, 2, 792, and 21 U.S.C. §§ 841(a)(1), 856, and 846. This affidavit was reviewed by Assistant United States Attorney Alexander Uballez.

Respectfully submitted,

Jordan Spaeth
FBI Special Agent

Subscribed telephonically and sworn electronically on July 27, 2021.

UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW MEXICO

Page **59** of **59**

**ATTACHMEHT A**

**Property to Be Searched**

**Target Phone 1**

**TARGET PHONE 1**: LG LS860, IMEI 307KPQJ0096172

The cellular telephone listed above is currently located at the Federal Bureau of Investigation Albuquerque Field Office, 4200 Luecking Park Avenue NE, Albuquerque, New Mexico 87107.  This warrant authorizes the forensic examination of the Target Phone 1 for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

**Property to Be Seized**

1.  The property to be seized includes all records on the target phone described in Attachment A that relate to violations of Title 21 U.S.C. §§ 841(a)(1), 846, 856, and 18 U.S.C. §§ 1962(c), 1962(d), 922(g) and 924, 924(c), 792, and 2, and involve DAVID CHAVEZ, aka: "FLACO," EDNAMAY DELAROSA, ORLANDO ROYBAL, aka: "ORLIE," FRANK MADRID, aka: "BENZO," ELIZABETH PEREZ, aka "BREW TOWN QUEEN," ERNESTO PEREZ, aka: "ERNIE," NICOLE RESENDIZ, and CHRISTOPHER MICHAEL PEREZ, aka: "LIL CHUCO," aka "LIL CHRIS," including:

    a.  Any communication and information related to controlled substances;

    b.  Any communication and information related to the manufacture and/or distribution of controlled substances;

    c.  Lists of drug trafficking customers and related identifying information;

    d.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    e.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    f.  All bank records, checks, credit card bills, account information, and other financial records;

    g.  Any information related to firearms;

    h.  Any information related to the concealing or harboring of fugitive CHRISTOPHER MICHAEL PEREZ.

2.  Evidence of user attribution showing who used or owned the target phone at the time the things

described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.